IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | ) | |
|---|---|---|
| **DAROUSH EBRAHIME,** | ) | |
| | ) | |
| **Plaintiff,** | ) | No. 09 C 7825 |
| | ) | |
| v. | ) | **Magistrate Judge** |
| | ) | **Jeffrey Cole** |
| **THOMAS DART, Sheriff of Cook County,** | ) | |
| **COOK COUNTY,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff has been a pre-trial detainee at Cook County Jail since February 2007. His amended complaint, brought under 42 U.S.C. §1983, charges the Sheriff of Cook County, and several individual defendants with various civil rights violations stemming from an attack by a fellow detainee on October 20, 2009. The defendants have moved for summary judgment on those claims that allege they were deliberately indifferent to a substantial risk of harm to the plaintiff by failing to protect him from the attack and failing to respond quickly enough to put a stop to it.

### I.
### BACKGROUND

#### A.
#### Summary Judgment Under Local Rule 56.1

As always, the facts underlying this summary judgment proceeding are drawn from the parties' Local Rule 56.1 submissions. "For litigants appearing in the Northern District of Illinois, the Rule 56.1 statement is a critical, and required, component of a litigant's response to a motion for summary judgment." *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, –, (7th Cir. 2012). Local Rule

56.1 requires a party seeking summary judgment to include with its motion "a statement of material facts as to which the ... party contends there is no genuine issue and that entitle the ... party to a judgment as a matter of law." Local Rule 56.1(a)(3); *Ciomber v. Cooperative Plus, Inc*., 527 F.3d 635, 643 (7th Cir. 2008). Each paragraph must refer to the "affidavits, parts of the record, and other supporting materials" that substantiate the asserted facts. Local Rule 56.1(a)(3); *F.T.C. v. Bay Area Business Council, Inc*., 423 F.3d 627, 633 (7th Cir. 2005).

The party opposing summary judgment must then respond to the movant's statement of proposed material facts; that response must contain both "a response to each numbered paragraph in the moving party's statement," Local Rule 56.1(b)(3)(B), and a separate statement "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment," Local Rule 56.1(b)(3)(C); *Ciomber*, 527 F.3d at 643. Again, each response, and each asserted fact, must be supported with a reference to the record. Local Rule 56.1(b)(3)(B); *Cracco v. Vitran Exp., Inc*., 559 F.3d 625, 632 (7th Cir. 2009); *Bay Area Business Council, Inc*., 423 F.3d at 633.

The district court is entitled to enforce strict compliance with its local rules regarding summary judgment motions. *Yancick v. Hanna Steel Corp*., 653 F.3d 532, 537 (7th Cir. 2011); *Schmidt v. Eagle Waste & Recycling, Inc.,* 599 F.3d 626, 630 (7th Cir.2010). Responses and facts that are not set out and appropriately supported in an opponent's Rule 56.1 response will not be considered, *see Shaffer*, 662 F.3d at 442 (court need not consider any fact not contained in the parties' Rule 56.1 statements); *Bay Area Business Council*, 423 F.3d at 633 (court properly disregarded affidavits not referenced in 56.1 submission).

**B.**
**Facts**

On October 20, 2009, plaintiff was a pre-trial detainee housed in Division 10, Tier 2B of the CCDOC. (*Defendants' Statement of Material Facts* ("*Def.St.*"), ¶ 15; *Plaintiff's Response to Def. St.* ("*Pl.Rsp.*"), ¶ 15). Officers Jason Bobzin and Thomas Zriny were assigned to the 3 pm-11pm shift on that tier. (*Def.St.*, ¶ 16; *Pl.Rsp.*, ¶ 16). Sometime between 3 and 4 pm, the plaintiff reported the theft of some commissary item from his table to Officer Zriny. (*Pl.Rsp.*, ¶17; *Plaintiff's Local Rule 56.1(b)(3)(B) Statement (Pl.St.*"), ¶ 9; *Response to Pl.St.* ("*Def.Rsp*"), ¶ 9). The plaintiff accused another fellow inmate, Corey Young. (*Pl.St.* ¶ 9; *Def.Rsp.*, ¶ 9). The items didn't belong to him; they belonged to two of his associates in the CCDOC, Koh and Diaz. (*Pl.St.* ¶ 11; *Def.Rsp.*, ¶ 11). The plaintiff was known to congregate with those two on a regular basis, incuding the day the items were stolen from their table. (*Pl.St.* ¶¶ 19-21; *Def.Rsp.*, ¶ 19-21).

Officer Zriny searched Young's cell while all the inmates were at the gym and discovered the stolen items. (*Pl.St.* ¶ 12; *Def.Rsp.*, ¶ 12). After learning of the theft, the shift commander – Captain Ortega – instructed Sergeant Helms to have Young transferred to another tier. (*Pl.St.* ¶ 13; *Def.Rsp.*, ¶ 13). This was a common response when an inmate had committed theft, and the idea was to avoid any problems like fights between inmates. (*Pl.St.* ¶ 14; *Def.Rsp.*, ¶ 14).

Sometime between 5 and a little after 6 pm, after all detainees had returned from the gym, plaintiff was seated at a table in the common area of Tier 2B. (*Def.St.*, ¶ 18; *Pl.Rsp.*, ¶¶ 17-18). By that time, Young knew that he had been fingered by an inmate for stealing and that he was going to be punished by being sent to another tier. (*Pl.St.* ¶ 28; *Def.Rsp.*, ¶ 28). Officer Zriny told Young to go to his cell to collect his belongings. (*Pl.St.* ¶ 16; *Def.Rsp.*, ¶ 16). The plaintiff and Officer

Zriny testified that Officer Zriny was walking behind Young through the common area when Young suddenly lunged and attacked the plaintiff. (Ebrahime Dep., at 39-40; Zriny Dep., at 71-73); Officer Bobzin testified that he and Officer Zriny and were still in the interlock[1] and Young was unescorted when he attacked Ebrahime. (Bobzin Dep., at 107). Officer Zriny added that he was about five feet behind Young and Young was not restrained in any fashion as he walked through the common area. (*Pl.St.* ¶ 36; *Def.Rsp.*, ¶ 36).

The plaintiff testified that Young hit him in his head, face, neck, and eyes before he fell down. (Ebrahime Dep., at 41). He thought Young may have hit him more than five times, but he didn't count the blows and he didn't know how many times Young hit him before he fell to the floor. (Ebrahime Dep., at 41, 44). After he was on the ground, he didn't remember much because it was as if he "went into a coma somehow." (Ebrahime Dep., at 43). He could not say how long the beating lasted. (Ebrahime Dep., at 44; *see Pl.St.*, ¶¶ 37-38; *Def.Rsp.*, ¶¶ 37-38). The defendants also do not say how long the attack lasted before correction officers stepped in. They simply assert that "[s]everal officers stepped in to stop the attack, including [Officer] Zriny, and a call was immediately made for more officers to assist. (*Def.St.*, ¶ 33; *Pl.Rsp.*, ¶ 33). Those additional officers – ten to fifteen in number – arrived a minute or two later. (*Def.St.*, ¶ 33; *Pl.Rsp.*, ¶ 33).

Prior to this incident, Officer Zriny knew Young to be a compliant inmate, and had no knowledge of any violent or aggressive tendencies by Young. (*Def.St.*, ¶ 22; *Pl.Rsp.*, ¶ 22). Plaintiff testified that he had known Young approximately 10 days at that time, and prior to this incident he did not have any problems with Young. (*Def.St.*, ¶ 23; *Pl.Rsp.*, ¶ 23). Young had never threatened

---

[1] Officer Zriny testified that the interlock door was close to where the plaintiff was seated: "the door is actually right there." (Zriny Dep., at 73).

the plaintiff with physical violence prior to the attack. (*Def.St.*, ¶ 24; *Pl.Rsp.*, ¶ 24). Plaintiff testified that he did not know Young would attack him. It happened "all of the sudden" and it was "shocking for him." (*Def.St.*, ¶¶ 27-29; *Pl.Rsp.*, ¶¶ 27-29). Plaintiff, however, disputes that Officers Zriny and Bobzin didn't know Young would attack him because he had been the one that accused Young of stealing.

     The CCDOC has an established grievance procedure for detainees to follow to redress their complaints short of federal litigation. Part of the CCDOC administrative grievance procedure includes an appeal process where detainees are required to appeal a response to their grievance within 14 days of their receipt of the grievance response. According to the defendants, a thorough review of the CCDOC grievance records reveals that plaintiff submitted one grievance between October 20, 2009, and December 16, 2009. That grievance was dated November 16, 2009, was received by CCDOC staff on December 3rd, and was assigned a control # 2009x2509. Plaintiff received a written response on December 8 – he signed a receipt for it – which informed him that his matter was being referred to the division physician. Immediately below the receipt signature line it says: Request for Appeal APPEALS MUST BE MADE WITHIN 14 DAYS OF THE DATE THE DETAINEE RECEIVED THE RESPONSE. (*Def.St.*, ¶¶ 37-46; *Pl.Rsp.*, ¶¶ 37-46). The plaintiff concedes that he did not appeal the response to this grievance. (*Def.St.*, ¶ 47; *PlRsp.*, ¶ 47). But he contends that grievance # 2009x2509 doesn't deal with the attack, but with medical treatment for back pain he suffered as a result of the attack. (*Pl.St.*, ¶6; *Def.Rsp.*, ¶ 6). The plaintiff also claims that he filed two other grievances that did pertain to the attack, the first on October 21, 2009, and the second on October 23, 2009. He says he submitted them to a social worker – which is proper procedure – but didn't remember which one. He has never received a response to either of these

grievances. The defendant disputes that the plaintiff ever properly filed the two grievances because at his deposition, the plaintiff could not recall which social worker he gave them to. (*Pl.St.*, ¶¶ 3-8; *Pl.Exs*. 2, 3; *Def.Rsp.*, ¶¶ 3-8).

## II.
## ANALYSIS

### A.
### Summary Judgment

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). On summary judgment, a court may not weigh the evidence or decide which inferences should be drawn from the facts. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Still, "a factual dispute is 'genuine' only if a reasonable jury could find for either party." *Rosario v. Brawn*, 670 F.3d 816, 820 (7th Cir. 2012)(citation omitted). To survive summary judgment, a non-moving party must "show through specific evidence that a triable issue of fact remains on issues for which the nonmovant bears the burden of proof at trial." *Knight v. Wiseman*, 590 F.3d 458, 463-64 (7th Cir. 2009)(citation omitted). The evidence the nonmovant submits in support of his position must be sufficiently strong that a jury could reasonably find for the nonmovant. *Id.*

### B.
### Exhaustion of Administrative Remedies

The defendants argue that the plaintiff failed to exhaust his administrative remedies prior to filing his lawsuit. The Prison Litigation Reform Act ("PLRA") mandates that "no action shall be brought with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, by a

prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. §1997(e). The PLRA was a response to the fact that prisoner litigation is an outsized share of the filings in federal district court. *Woodford v. Ngo,* 548 U.S. 81, 94, n. 4 (2006); *Jones v. Bock*, 549 U.S. 199, 203 (2007). While most of these cases are meritless or frivolous, it is nonetheless important "that the flood of nonmeritorious claims does not submerge and effectively preclude consideration of the allegations with merit." *Id.* at 203. "Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record." *Id.* at 203-204.

The Seventh Circuit has taken a "strict compliance approach to exhaustion," meaning that the prisoner must properly use the prison's grievance system. *Santiago v. Anderson*, __ F.3d –, –, 2012 WL 3164293, *5 (7th Cir. 2012); *Dole v. Chandler,* 438 F.3d 804, 809 (7th Cir.2006). But the defendants bear the burden of proving nonexhaustion, and "they must do more than point to a lack of evidence in the record; rather, they must establish affirmatively that the evidence is so one-sided that no reasonable fact finder could find that the plaintiff was prevented from exhausting his administrative remedies." *Santiago*, – F.3d at –, 2012 WL 3164293, *5; *Branham v. Snow,* 392 F.3d 896, 906–07 (7th Cir.2004).

That's a problem for the defendants here. In *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002), the Seventh Circuit followed the Fifth and the Eight Circuits in deeming administrative remedies exhausted when prison officials fail to respond to inmate grievances because those remedies had become "unavailable." 300 F.3d at 833 (citing *Powe v. Ennis,* 177 F.3d 393, 394 (5th

7

Cir.1999); *Underwood v. Wilson,* 151 F.3d 292, 295 (5th Cir.1998) (per curiam); *Foulk v. Charrier,* 262 F.3d 687, 698 (8th Cir.2001); *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001). The court "refused to interpret the PLRA so narrowly as to permit [prison officials] to exploit the exhaustion requirement through indefinite delay in responding to grievances." *Lewis*, 300 F.3d at 833(quotation omitted). So, if prison officials fail to respond to a properly filed grievance, the inmate is considered to have exhausted his remedies and may file suit. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006); *Brengettcy v. Horton*, 423 F.3d 674, 682 (7th Cir. 2005). The question here is whether the two additional grievances were properly filed.

The defendants say they were not properly filed because the plaintiff could not recall the name of the social worker he submitted the grievances to. The plaintiff explained that the social worker assignments changed frequently. (Plaintiff's Dep., at 111). But that doesn't mean he didn't file them. *See White v. Bass*, 2011 WL 1303393, *5 (N.D.Ill. 2011)("Notably, Defendants do not provide an affidavit from any correctional officer at the prison or any other type of evidence to attempt to refute that the prison dropped the ball on Plaintiff's grievance."). And if that's all the defendants can point to, they have not carried their burden of having demonstrated the plaintiff did not exhaust his administrative remedies. *Santiago*, – F.3d at –, 2012 WL 3164293, *5; *Branham v. Snow,* 392 F.3d 896, 906–07 (7th Cir.2004). The issue becomes a matter of credibility, which cannot be resolved in a summary judgment proceeding. *O'Leary v. Accretive Health, Inc*., 657 F.3d 625, 630 (7th Cir. 2011).

In their reply brief, defendants claim that, as part of the administrative procedure in effect at the time the two grievances were filed, a social worker would sign submitted grievances and date them when received. But this is not a point raised in the defendants' response to the plaintiff's

statement of additional facts. Thus, it is not properly in the record and need not be considered. *Shaffer*, 662 F.3d at 442 (court need not consider any fact not contained in the parties' Rule 56.1 statements); *Bay Area Business Council*., 423 F.3d at 633 (court properly disregarded affidavits not referenced in 56.1 submission). Moreover, there is no evidence to suggest that this was, in fact, the procedure. There is nothing more than a statement from an attorney in the defendants' brief and that is not evidence. *Woolard v. Woolard,* 547 F.3d 755, 760 (7th Cir.2008); *United States v. Stevens,* 500 F.3d 625, 628-629 (7th Cir.2007); *Ner Tamid Congregation of North Town v. Krivoruchko*, 620 F.Supp.2d 924, 928 (N.D.Ill. 2009)(collecting cases). And finally, although it's not an argument the plaintiff had an opportunity to make, one of the two grievances – from October 23, 2009 – was signed as received on October 27th. (*Pl.Ex.* 3).

Defendants also attempt to avoid the holdings in *Dole* and *Brengettcy* by arguing that the plaintiffs in those cases followed up on their grievances when they had not heard back in the designated time period. The plaintiff in this case, argues that the defendants, have presented no evidence that he did the same. He may well have followed up, but as the defendants' argument comes in their reply brief, he has had no opportunity to respond. Beyond that, neither *Dole* nor *Brengettcy* set forth a rule that an inmate must follow up, in some unspecified fashion, on grievances that fall on deaf ears. Courts of this district certainly have not read the cases in that fashion. *See, e.g., Smith v. Hardy* ,2012 WL 2127488, *4 (N.D.Ill. 2012)("Here, there is nothing in the record to suggest that Plaintiff should have taken additional steps or contacted another correctional official once he filed his three unanswered grievances. Thus, the record presents a genuine dispute as to the material fact of whether Plaintiff submitted the grievances as he alleged, and if so, whether the grievances went unanswered."). And, it should be noted that the "follow up" in *Brengettcy* was the

9

inmate filing repeated grievances regarding the same event. 423 F.3d at 677. The plaintiff here may have filed as many as three. But, even though there may be a genuine issue of material fact on the question of exhaustion of administrative remedies, it does not matter because the plaintiff has not shown that there is a triable issue of fact on the question of whether the defendants were deliberately indifferent.

## C.
## Deliberate Indifference

The defendants argue that the plaintiff cannot establish that there is a genuine issue of fact as to whether they were deliberately indifferent to the attack. In this case, there are two components to the deliberate indifference calculus: preventing the attack in the first place and stopping it before it went on too long. The defendants submit that plaintiff, himself, did not know or apprehend that the attack was going to occur, and therefore he cannot show that the defendants knew of a substantial risk of the attack. And, they maintain that, once Young jumped the plaintiff, the guards' response was reasonable.

To prove deliberate indifference, the plaintiff needs to show that the defendants knew of a substantial risk of serious injury to him and failed to protect him from that danger. *See Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Shields v. Dart*, 664 F.3d 178, 181 (7th Cir. 2011). While there is always a general risk of violence at a place like the Cook County Jail, that is not enough to establish knowledge of a substantial risk of harm. *Shields*, 664 F.3d at 181; *Dale v. Poston,* 548 F.3d 563, 568 (7th Cir.2008). Were that enough, prison officials would, in effect, become strictly liable for all violence in the institution. And that, of course, is not the law. A plaintiff must show a

10

tangible threat to his safety or well-being, *Grieveson v. Anderson,* 538 F.3d 763, 777 (7th Cir.2008), that the defendants were subjectively aware of the risk, yet failed to take reasonable measures to prevent it. *Borello v. Allison,* 446 F.3d 742, 747 (7th Cir.2006); *Hunt ex rel. Chiovari v. Dart*, 754 F. Supp. 2d 962 (N.D. Ill. 2010).[2]

For the plaintiff, the threat here was the fact that he had accused Young of stealing, and when that accusation proved to be true, Young was told he'd be transferred to another tier, thereby giving rise to a threat the defendants should have anticipated and taken steps to prevent from being acted on. But plaintiff, himself, did not feel there was a threat – the attack came as a complete surprise to him – and Young was not known to the guards to be a troublesome inmate.[3] Moreover, Young

---

[2] The same standard applies for pretrial detainees and incarcerated individuals, though pursuant to the Fourteenth Amendment rather than the Eighth Amendment. *Estate of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 989 (7th Cir. 2012). Accordingly, although plaintiff was a pretrial detainee, cases dealing with incarcerated convicts are cited in this opinion as well.

[3] *Compare Cottone v. Jenne*, 326 F.3d 1352 (11th Cir. 2003) (plaintiff's Fourteenth Amendment complaint that the officials acted objectively and subjectively unreasonably to the risk of inmate-on-inmate violence survived dismissal because the officers knew they were guarding a violent schizophrenic and they took consecutive breaks and played computer games at the time of the decedent inmate's murder); *Adames v. Perez*, 331 F.3d 508 (5th Cir. 2003) (plaintiff attempted to show that the officers should have been aware of the risk that he would be harmed by another inmate because the officers failed to follow the prison safety procedure by checking each cell door every half hour and because prison officials knew that plaintiff was classified as a "potential victim"); *Barreto v. County of Suffolk*, 762 F. Supp. 2d 482 (E.D.N.Y. 2010) (prisoner allowed to proceed on his § 1983 claim that, as a result of defendant county's policy of not separating violent and non-violent inmates, he was attacked by an inmate with a known history of attacking fellow inmates. Refusing to segregate such violent prisoners suggests deliberate indifference to inmate safety. *Peart v. Seneca County*, 808 F. Supp. 2d 1028 (N.D. Ohio 2011) (Defendants not entitled to summary judgment on detainee's claim that, because they failed to follow the jail's classification protocol—which relied on criteria like an inmate's prisoner convictions and history of violence—he sustained serious head injuries from an unprovoked assault by an inmate with violent propensities). *Cf., Anderson v. Wilkinson*, 440 Fed. Appx. 379 (5th Cir. 2011) (Reversing and vacating judgment for prisoner who had boiling water thrown directly in his face by another inmate. The lower court found defendant warden liable on the grounds that by making the microwave available to inmates during sleeping times, without adequate monitoring or security, he was deliberately indifferent to the serious risk of hot-water-throwing attacks. However, the evidence adduced at trial failed to show that hot-water-throwing attacks were "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past.").

did not know plaintiff reported him; he only knew that plaintiff's associates had reported their items stolen. While there may have been a set of circumstances allowing Young to make an educated guess that plaintiff reported him on behalf of his friends, the defendants would still have to piece all that together and then go the extra step of assuming that Young – described as a "compliant" inmate – would attack the plaintiff. Seventh Circuit precedent requires quite a bit more than a set of circumstances giving rise to a potential threat to meet the definition of deliberate indifference.

"A prisoner normally proves actual knowledge of impending harm by showing that he complained to officials about a specific threat to his safety." *McGill v. Duckworth,* 944 F.2d 344, 349 (7th Cir.1991); *Morris v. Ley*, 331 Fed.Appx. 417, 419, 2009 WL 1784081, *2 (7th Cir. 2009). Even in cases where there are actual, albeit vague, threats, the Seventh Circuit has determined that it is not sufficient to demonstrate guards were aware of a substantial risk of serious harm. *See Whaley v. Erickson*, 339 Fed.Appx. 619, 622, 2009 WL 2222084, *2 (7th Cir. 2009)(inmate had conversation with defendant in which he told him his assailant was "making threats"); *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008)(vague statements that inmates were "pressuring" him and "asking questions" were simply inadequate to alert the officers to the fact that there was a true threat at play); *Grieveson v. Anderson,* 538 F.3d 763, 776 (7th Cir.2008) (holding that an inmate who "told jail officials only that he was afraid and that he wanted to be moved" failed to put those officials on notice of an actionable threat).

One more example: where there the potential for an assault was even more apparent is that in *Shields* or *Grieveson* because it was bolstered by a history of attacks, is *Yeadon v. Lappin*, 423 Fed.Appx. 627, 2011 WL 2023428 (7th Cir. 2011). In *Yeadon*, an inmate became the target for assaults by white supremacists after assisting the government with the prosecution of one of their

12

members. Prison officials reacted to the assaults by either placing the inmate in protective housing or transferring him to another facility. Things quieted down until a television show was broadcast about the case. The inmate had requested a move to a facility without cable television where the program would not be seen, but instead he was moved to a notoriously dangerous prison filled with gang members. He was immediately assaulted and was placed in special housing and then transferred two more times. The Seventh Circuit determined that the authorities were not deliberately indifferent because they had not been aware of any threats to the inmate and had taken corrective measures swiftly each time an assault had occurred. "The fact that officials could have taken a different approach does not make their chosen actions unreasonable." *Yeadon v. Lappin*, 423 Fed.Appx. 627, 630, 2011 WL 2023428, *3 (7th Cir. 2011)(citing *Dale,* 548 F.3d at 569–70).

Here, the defendants' level of awareness does not approach that in *Yeadon* nor was there a threat of harm remotely comparable to that in *Yeadon*. There was nothing to suggest that Young though it was the plaintiff who had turned him in. He and the plaintiff had not had any previous beefs. And the defendants were in the process of taking action to perhaps head off any potential problems that might have occurred due to Young's theft. The fact that they could have escorted Young to his cell while he was restrained does not mean the action they did take was unreasonable. Based on the parties Local Rule 56.1 submissions, the attack came as a surprise to everyone, with the exception of Young, of course.

The plaintiff also has a problem with how long it took the guards to intervene once Young attacked him. The plaintiff himself does not know how much time passed – he thought he had been hit perhaps five time before Officer Zriny stepped in. Officer Zriny called for backup which arrived,

13

in force, within a minute or two. Under Seventh Circuit jurisprudence, that's a reasonable response – in fact, it's a rather rapid response.

Correctional officers who are present during a violent altercation between inmates are not deliberately indifferent if they intervene with a due regard for their safety. *Shields v. Dart*, 664 F.3d 178, 181 (7th Cir. 2011). They need not respond on their own when that response would put them in significant jeopardy. *Shields*, 664 F.3d at 181; *Guzman v. Sheahan,* 495 F.3d 852, 858 (7th Cir.2007). Here, Officer Zriny did respond on his own and, assuming Young had delivered as many as five blows to the plaintiff, he did so within a matter of seconds. Moreover, he summoned backup, which arrived in one or two minutes.

In *Shields*, the guard did not step in or even command the inmate to cease the attack, but called for backup. That backup took as long as *twenty minutes* to arrive but, while the Seventh Circuit found the response time "troubling," it was nevertheless "insufficient to constitute deliberate indifference." 664 F.3d at 182. Along these lines, the guard in *Guzman* did not intervene when the inmate was hit and then beaten with a broom handle. Instead, she left her post for about three minutes in search of backup, which arrived minutes later to subdue the inmates. 495 F.3d at 853-54, 58-59. This was not deliberate indifference, and summary judgment was sustained in favor of the defendants. Unlike those cases, here, a guard intervened within a matter of seconds and summoned help, which arrived in one or two minutes. The response – whether one or five or ten blows had been delivered – was swifter than in either *Shields* or *Guzman*.[4]

---

[4] Notably, in *Shields* and *Guzman*, the officers who witnessed the attacks were female. But there cannot be a different Eighth Amendment standard applied to responses to attacks depending on the gender of the guard, and we do not read the Seventh Circuit cases to suggest anything of the sort. In any event, this is not an
(continued...)

14

Plaintiff submits that because Officers Zriny and Bobzin testified differently as to where Zriny was at the time – Bobzin said they were both in the interlock and Zriny said he was five feet behind Young – this alone demonstrates that there are genuine issues of fact as to the response to Young's attack on the plaintiff. Recall, however, that the plaintiff himself testified that Zriny was walking behind Young, and that the interlock was right near where the attack occurred. The point being that, in any case, the response was swifter than in either *Shields* or *Guzman*.

In this regard, the plaintiff seeks to compare this case to *Mayoral v. Sheahan*, 245 F.3d 934 (7th Cir. 2001), where the stories of two corrections officer didn't match. But in *Mayoral*, there was an obvious threat that was known to the officers. The inmate specifically requested protective custody. Moreover, one of the corrections officers observed the inmates being rowdy and seemingly intoxicated. There was, the court found, a significant risk of harm to inmates. And, the response was clearly unreasonable: one of the two officers told one of the inmates to take control of "his guys," thereby abdicating his responsibility and putting the fate of the inmates in the hands of one of the inmates. 245 F.3d at 940. In this case, as already discussed, the officers had no knowledge of a threat to the plaintiff and were, in fact, taking steps to head off any trouble that might develop in the wake of Young's theft. And, most importantly, no matter who is credited as to Zriny's location, he was steps away and the response to Young's attack was reasonable.

Could the officers here have done more? Maybe, but that's not the standard the Seventh Circuit has set out for their response. The officers rather easily meet the benchmark drawn from

---

[4](...continued)
argument the plaintiff raises as the plaintiff completely ignores the circumstances and holdings in both *Shields* and *Guzman.*

cases like *Shields* and *Guzman*, where the response time was measured not in a few seconds but in several minutes. Accordingly, the defendants are entitled to summary judgment on the plaintiff's claims they were deliberately indifferent to a substantial risk of harm to him by failing to protect him from the attack and failing to respond quickly enough to put a stop to it.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment [#82] is GRANTED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 10/22/12